**2023-2393**

# United States Court of Appeals
# for the Federal Circuit

**BIOMEDIAL DEVICE CONSULTANTS & LABORATORIES
OF COLORADO, LLC,**

*Plaintiff-Appellant*

v.

**VIVITRO LABS INC.,**

*Defendant-Appellee*

Appeal from the United States District Court for the
Central District of California in 2:23-CV-04291-HDV-E,
Judge Hernán D. Vera

**CORRECTED RESPONSE BRIEF OF APPELLEE VIVITRO LABS, INC.**

WARREN J. THOMAS
JOHN W. HARBIN
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree St NE, Suite 1300
Atlanta, GA 30309
(404) 645-7700
WThomas@mcciplaw.com
JHarbin@mcciplaw.com

*Counsel for Defendant-Appellee*

November 28, 2023

## EXEMPLARY CLAIM OF U.S. PATENT NO. 9,237,935

1. A device for accelerated cyclic testing of a valved prosthetic device comprising

   a pressure source configured to drive a test system fluid cyclically within the device above a normal physiological rate, at an accelerated pulsed rate of greater than 200 beats per minute within the device; and

   a pressurizable test chamber for containing the test system fluid and further comprising

   a fluid distribution chamber positioned on a first side of the valved prosthetic device and in fluid communication with the pressure source;

   a fluid return chamber positioned on a second side of the valved prosthetic device;

   a fluid return conduit both structurally and fluidly connecting the fluid distribution chamber to the fluid return chamber; and

   an excess volume area capable of operating at the accelerated pulsed rate, wherein the excess volume area is in fluid communication with the fluid return chamber providing a volume for storing a volume of a test system fluid when the test system fluid is under compression.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-2393 |
| **Short Case Caption** | Biomedical Device Consultants & Laboratories v. Vivitro ☐ |
| **Filing Party/Entity** | ViVitro Labs, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/28/2023

Signature:  /s/ Warren J. Thomas

Name:  Warren J. Thomas

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| ViVitro Labs Inc. | | Starfish Holdings Inc., of Canada |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

iii

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| Jeffrey H. Grant | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................1

II.   COUNTER-STATEMENT OF THE ISSUES ...............................3

III.  COUNTER-STATEMENT OF THE FACTS ................................4

  A. The parties and the industry..................................................4

  B. The alleged novel feature of the '935 patent was already well known in the art. .................................................................................5

     1.  The '935 patent discloses an accelerated tester with compliance chambers..........................................................................6

     2.  BDC's statements during prosecution are contradicted by the prior art. ...7

  C. ViVitro's ADC tester...........................................................11

  D. Litigation history and preliminary injunction proceedings. ...........12

     1.  ViVitro denies infringement and provides prior art to BDC during pre-suit communications..................................................12

  E. The district court denies the preliminary injunction. ....................13

     1.  The district court initially construes the excess volume area term. .........13

     2.  The district court finds substantial question of infringement...................14

     3.  The district court finds substantial questions of validity..........................15

IV.  STANDARD OF REVIEW ........................................................16

V.   SUMMARY OF THE ARGUMENT............................................19

VI.  ARGUMENT.............................................................................22

  A. The district court properly exercised its discretion in finding ViVitro likely does not infringe. .......................................................23

     1.  The district court's construction of the term excess volume area is not an abuse of discretion. ...............................................24

        a.  An excess volume area is a separate structure, specifically a compliance chamber as disclosed in the patent. ................................24

        b.  BDC's arguments from a related proceeding support the district court's findings. .................................................................30

        c.  Alternatively, excess volume area should be construed as a means-plus-function term. ...........................................................32

d. The proposed construction does not conflict with claim differentiation doctrine. ............................................................................35

2. Applying the proposed construction of excess volume area requires affirmance. ..............................................................................36

3. Regardless of the construction of excess volume area, the district court's finding of substantial question of infringement should be affirmed. ........37

B. The district court did not abuse its discretion when it correctly found there is a substantial question of validity. ...............................................38

1. Legal standards specific to likelihood of success on the merits and patent validity. ..............................................................................38

2. The district court's finding of likely anticipation was not clearly erroneous. ...........................................................................39

a. Dynatek discloses fluid communication between an excess volume area and a return chamber. ................................................41

b. BDC's argument that the entire claimed "test system" must be "under compression" is not supported by the claim language or specification. . ..............................................................................45

c. The record supports the finding that Dynatek discloses a capacitance tank capable of operating as a compliance chamber at an accelerated rate. .................................................................................47

d. ViVitro challenged the validity of all asserted claims, so it is irrelevant that ViVitro challenged only four as anticipated. ................................50

3. The district court correctly found there is a substantial question of validity as to obviousness over Dynatek, alone or in combination with Xi. .............................................................................................50

a. BDC's re-interpretation of the Court's order lacks merit. ...................53

b. BDC's arguments against Dynatek and Xi are wrong, and fail to identify any clearly erroneous factual finding or other abuse of discretion. ...........................................................................54

(i) Xi discloses air chambers on both sides of the valve being tested. 54

(ii) There is ample evidence of a motivation to combine. ...................59

(iii) BDC's arguments about incorporating Xi into Dynatek are based on misinterpretations of the claims, an incorrect obviousness

analysis, and ignore the motivations for the combination identified by ViVitro. .................................................................................63

c. BDC failed to show the required nexus between the claim language and any alleged secondary considerations. .........................................64

VII.   CONCLUSION..............................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
  566 F.3d 999 (Fed. Cir. 2009) .................................................................18

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ........................................... 18, 20, 45

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ...........................................................43

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
  726 F.3d 1296 (Fed. Cir. 2013) ...........................................................19

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) ...........................................................47

*Axonics, Inc. v. Medtronic, Inc.*,
  73 F.4th 950 (Fed. Cir. 2023) ..................................................... 62, 69

*BlephEx, LLC v. Myco Indus., Inc.*,
  24 F.4th 1391 (Fed. Cir. 2022) ................................................ 20, 44, 73

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002) .............................................................54

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
  150 F.3d 1354 (Fed. Cir. 1998) ...........................................................55

*Digital Biometrics, Inc. v. Identix, Inc.*,
  149 F.3d 1335 (Fed. Cir. 1998) ...........................................................50

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...............................................................17

*Entegris, Inc. v. Pall Corp.*,
  490 F.3d 1340 (Fed. Cir. 2007) ...........................................................45

*Fox Factory, Inc. v. SRAM, LLC*,
  944 F.3d 1366 (Fed. Cir. 2019) ...........................................................70

*Glaxo Grp. Ltd. v. TorPharm, Inc.*,
   153 F.3d 1366 (Fed. Cir. 1998) ...................................................44

*Golden v. Apple Inc.*,
   819 F. App'x 930 (Fed. Cir. 2020) ...........................................43

*Holdings, Inc. v. Infineon Techs. AG*,
   881 F.3d 1323 (Fed. Cir. 2018) ...................................................17

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
   822 F.3d 1312 (Fed. Cir. 2016) ...................................................42

*iLOR, LLC v. Google, Inc.*,
   550 F.3d 1067 (Fed. Cir. 2008) ...................................................42

*In re Chudik*,
   706 F. App'x 670 (Fed. Cir. 2017) .............................................54

*In re Fulton*,
   391 F.3d 1195 (Fed. Cir. 2004) ...................................................68

*In re Liquid Dispensing Sys. Patent Litig.*,
   No. 1:18-MD-02832-KMM, 2019 WL 12023099 (S.D. Fla. Dec. 16, 2019) ......48

*In re Merck & Co., Inc.*,
   800 F.2d 1091 (Fed. Cir. 1986) ...................................................62

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016) ...................................................33

*Int'l Communication Materials v. Ricoh Co.*,
   108 F.3d 316 (Fed. Cir. 1997) .....................................................19

*Inventio AG v. Otis Elevator Co.*,
   497 F. App'x 37 (Fed. Cir. 2012) ...............................................73

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
   22 F.4th 1369 (Fed. Cir. 2022) ...................................................34

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
   485 F.3d 1157 (Fed. Cir. 2007) ...................................................68

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) ......................................................... 26, 27

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
    941 F.3d 1133 (Fed. Cir. 2019) ......................................................... 73

*MasterMine Software, Inc. v. Microsoft Corp.*,
    874 F.3d 1307 (Fed. Cir. 2017) ......................................................... 18

*MTD Prod. Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019) ......................................................... 39

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004) ......................................................... 16

*Neville v. Found. Constructors, Inc.*,
    972 F.3d 1350 (Fed. Cir. 2020) ......................................................... 34

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ......................................................... 50

*OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*,
    785 F. App'x 871 (Fed. Cir. 2019) ......................................................... 45

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
    44 F.4th 1379 (Fed. Cir. 2022) ......................................................... 21

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014) ......................................................... 68

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 29, 31

*Polaroid Corp. v. Eastman Kodak Co.*,
    789 F.2d 1556 (Fed. Cir. 1986) ......................................................... 22

*Prometheus Lab'ys, Inc. v. Roxane Lab'ys, Inc.*,
    805 F.3d 1092 (Fed. Cir. 2015) ......................................................... 70

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
    853 F.3d 1370 (Fed. Cir. 2017) ......................................................... 33

*Saeilo Inc. v. Colt's Mfg. Co.*,
  26 F. App'x 966 (Fed. Cir. 2002) ............................................................42

*Sequoia Tech., LLC v. Dell, Inc.*,
  66 F.4th 1317 (Fed. Cir. 2023) ...............................................................37

*SightSound Techs., LLC v. Apple Inc.*,
  809 F.3d 1307 (Fed. Cir. 2015) ..............................................................37

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) ..............................................................41

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
  8 F.4th 1349 (Fed. Cir. 2021) .................................................................70

*TF3 Ltd. v. Tre Milano, LLC*,
  894 F.3d 1366 (Fed. Cir. 2018) ..............................................................32

*the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................17

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372 (Fed. Cir. 2009) ..............................................................45

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) ........................................................ 22, 27

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) ................................................................21

*United States v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948) ................................................................................21

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ........................................................ 38, 39

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................26

**Statutes**

35 U.S.C. § 112 ............................................................................ 38, 39, 41

## STATEMENT OF RELATED CASES

No other appeal in or from this action was previously before this or any other appellate court. Appellee ViVitro Labs Inc. (ViVitro) is not aware of any case that will directly affect or be directly affected by this appeal under Fed. Cir. R. 47.5(a).

## I.    INTRODUCTION

The district court properly denied BDC's motion for preliminary injunctive relief. ViVitro showed that the accused product lacked any structure at all that corresponded to the "excess volume area" disclosed by the '935 Patent, and therefore could not infringe. ViVitro also showed the district court that all asserted claims were anticipated or obvious over the cited prior art—none of which was before the Patent Office—based on both the plain language of those references and a 55-page expert declaration by Dr. Dasi (a PhD in fluid dynamics and researcher in the field of prosthetic heart valve engineering). The art in the record shows that years before the patent's priority date, *all* commercially available heart valve testers already included adjustable compliance to address the well-known "water hammer" effect. BDC eventually admitted to the district court that one of these testers included a "compliance chamber," which elsewhere it agrees is an "excess volume area."

Dasi opined that all the elements of the claims were in the prior art and that, regarding obviousness, there was ample motive to combine the references. Xi, one of those references, expressly discloses the "downstream" compliance chamber that BDC claims it invented years later in '935 patent. BDC did not submit any rebuttal to Dasi's declaration. In contrast, BDC's expert's *opening* declaration fails to use all of BDC's own claim interpretations and is largely conclusory. Ample evidence supports the court's denial of the injunction.

BDC frames this appeal as about the meaning of the term "excess volume area. But BDC fails to propose a single definition of this term, much less apply it consistently for infringement and validity. For infringement, BDC alleges that an "excess volume area" is "an area in which excess volume can be stored" without any structure at all. Then, for validity, BDC re-interprets the claims to add unsupported limitations, e.g., that the excess volume area stores fluid during a "drive stroke" of a pump and that there be "net compression" on the entire "test system."

The district court correctly cut through BDC's contradictory positions and construed the claims as referring to the structures that the specification explains provide the "excess volume area" function. Applying that construction, the district court found that both validity and infringement were doubtful. But even if the claims were construed according to one of BDC's inconsistent interpretations,

BDC's claims would be, at a minimum, either not infringed or invalid under a consistent application of those interpretations. Thus, it was not clearly erroneous for the district court to find that BDC failed to show a likelihood of success on the merits and therefore deny the injunction.

## II.    COUNTER-STATEMENT OF THE ISSUES

2.    Whether the district court correctly construed the "excess volume area" term where that term lacks an established meaning in the art or the patent, and where the claims and intrinsic evidence (and the patentee's arguments) only describe that element as a function provided by structures disclosed in the patent?

3.    Whether the district court committed clear error in finding the Appellee raised a substantial question of whether the asserted patent has been infringed?

4.    Whether the district court committed clear error in finding the Appellee raised a substantial question as to the invalidity of the patent, where, *inter alia,* all the elements are in the prior art and multiple accelerated test system references not considered by the examiner disclose or teach the *excess volume area* limitation that the patentee argues is a key point of novelty, and there is clear evidence in the record of motive to combine.

III.    COUNTER-STATEMENT OF THE FACTS

A.    The parties and the industry

ViVitro is a leading test equipment and contract testing services company specializing in providing engineering solutions to cardiovascular medical device manufacturers and research organizations around the world. Its mission is to help bring safe, effective cardiovascular devices to market quickly. ViVitro's instruments and engineering solutions are the most widely cited equipment in academic and research publications. APPX1155 ¶¶ 4-5 (Declaration of ViVitro President Karim Mouneimné). Even Dr. Weinberg, a named inventor of the '935 patent and BDC executive, admits ViVitro is "well-known in the market for heart valve testing" with "a reputation for innovation." APPX0873-0874 ¶¶ 27, 29. ViVitro's latest innovation is the subject of this lawsuit.

ViVitro, BDC, and others sell test equipment for artificial heart valves. Artificial heart valves are tested to industry standards using heart valve test fixtures. APPX1179 ("Dasi Decl.") ¶¶ 31-32. These test fixtures generally include a motor, one or more test chambers where the valve is positioned, and a loop of tubing that re-circulates a test fluid that flows through the valve. APPX1179 ¶ 32. The re-circulating test fluid causes the valve being tested to open and close repeatedly, simulating the flow of blood in the heart. APPX1177 ¶ 25. Because an artificial heart valve is expected to last for years inside a patient, there is a clear

benefit to being able to perform testing at higher ("accelerated") speeds, so that a short period of testing can represent months or years of real-world use. APPX1255. "Accelerated" testers that address these problems were widely known and used by the 1990's. APPX1181 ¶¶ 37-38.

### B.     The alleged novel feature of the '935 patent was already well known in the art.

BDC and its declarants contend that BDC invented a "novel" test system that "revolutionized the market" because it "placed an 'excess volume area' on the outflow side of a sample test valve." Opening Brief at 3, 6.[1] They variously claim that the excess volume area "helps," "improves," and "aids" tester performance by controlling "undesirable pressure spikes," Opening Brief at 6-7; APPX0868-0869 ¶¶ 6, 9; APPX0911 ¶ 17. But they go even farther to claim that it is "*the novel aspect* of the '935 patent" and what "made possible" the success of the VDT-3600i. Opening Brief at 10-11 (emphasis added), 54-55. BDC's expert even states, "[w]ithout the excess volume area, the '935 Patented system *would not function*." APPX0911 ¶ 16 (emphasis added).

But the '935 patent does not expressly describe either the novelty or criticality of the feature as suggested by BDC. In fact, structures providing the

---

[1] Elsewhere, BDC argues that "*the novel aspect* of the '935 patent was its use of an excess volume area in an accelerated-rate tester to provide an excess volume area to store the stroke volume in a closed system running at accelerated rates (*i.e.*, >200 bpm)." Opening Brief at 10-11 (emphasis added).

claimed "compliance function" were known long before the 2009 filing date of the '935 patent.

### 1.   The '935 patent discloses an accelerated tester with compliance chambers.

The '935 patent itself, which was filed over a dozen years before this dispute began, barely describes the (allegedly) key feature. Aside from the claims, the phrase "excess volume area" is used only four times in the Specification—all but one instance in the Summary section, which generally follows the claim language. See APPX0025 at 2:65-3:18, APPX0029 at 12:4-9. The patent describes how the *compliance chamber* structures "provide" an "excess volume area" "for fluid to move into when the piston 114 performs a compression stroke." APPX0029 at 12:4-6. When that occurs, the compliance chambers "provide additional volume for displacement of the … fluid within the test chamber 106." APPX0029 at 12:6-9.

The Specification discloses a bit more detail about compliance chambers. Their "purpose" is "to act as a resilient spring force" to "dampen," "absorb," or "minimize" "changing pressure gradients across the test samples" in the test chamber. APPX0028 at 9:11-28; APPX0029 at 12:12-16. When the fluid pressure in the test chamber "returns to an initial level," the *excess volume returns* to the compliance chambers." APPX0029 at 12:29-31 (emphasis added). Thus, the compliance chambers, in "combination" with other elements, "help control undesirable pressure loading or pressure spikes within" and "generally help tune

6

the test conditions across the sample holder 129." APPX0029 at 12:12-18; APPX0029 at 12:19-24 (compliance chambers among adjustable variables for "fine-tuning").

Thus, while the patent describes how compliance chambers "help" tune and control the system, the patent does not teach the *novelty or criticality* of compliance chambers—much less an "excess volume area"— like BDC claims in this litigation. The '935 patent does not expressly recite any compliance chamber in its sole independent claim. It instead claims an "excess volume area" that is "in fluid communication with the fluid return chamber" and recites two functional aspects: It is "capable of operating at an accelerated pulsed rate" and it "provid[es] a volume for storing a volume" of fluid when that fluid "is under compression." The claim does not recite how the claimed excess volume area accomplishes these functions or provide any parameters for how it operates.

### 2.    BDC's statements during prosecution are contradicted by the prior art.

The parties agree that a known phenomenon at the priority date was that accelerated testing could create undesirable "pressure spikes"—the "water hammer" effect—because incompressible fluid cannot absorb the sudden pressure change from the driving mechanism. Opening Brief at 6, 11 (citing Dasi's explanation of "well-known water hammer arrestor"); APPX1175-1176 ¶¶ 21-22. BDC contends this was a "primary problem[]" that it solved with its purported

invention. APPX1329; *cf.* Opening Brief at 6. BDC has even characterized the "compliance chamber" in its patents and VDT-3600i as "akin to a water hammer arrestor." APPX1330.

During the pendency of '935 patent application, BDC submitted a Response to Office Action in a continuation application, which claimed priority to the '935 patent application. *See generally* APPX1381-1395 (June 2015 Response to Office Action from Application No. 14/523,104)).[2] While BDC admitted in that response that "using a compliance chamber to store excess volume of test fluid in a *real-time*,"—i.e., non-accelerated—test system was "well known" to accurately simulate arterial compliance (APPX1388, emphasis added), it represented that prior art *accelerated* test systems had "no specific design elements or system features" to address pressure spikes from the water-hammer effect. APPX1389. BDC argued that its "accelerated cyclic test system that uses an excess volume area [was] *entirely new*." APPX1388 (emphasis added). In the same response, BDC equated the claimed "excess volume areas" with "compliance chambers" using "i.e." APPX1391.

BDC's characterization of the prior art was false. Years before, a 2003 publication titled "On Accelerated Fatigue Testing of Prosthetic Heart Valves" disclosed that "all" of the most common accelerated testers included "adjustable …

---

[2] The '935 patent did not issue until January 2016.

compliance." APPX1256 (Lu reference). Lu explains the *same* "water hammer effect" that BDC discusses and identifies other prior art solutions using compliance to solve water hammer. APPX1257 ("The water hammer effect can be reduced with a built-in compliance …."); APPX1258 ("In order to maintain a constant transvalvular pressure, the compliance component can reduce the effects of the water hammer …."); APPX1258 (Section 2.5 describing effects of increased "loading force"); APPX1260 (suggesting mathematical relationship to control for water hammer force). Thus, both BDC's alleged problem (water hammer in accelerated testers) and the solution ("excess volume" or "compliance") were known in the field of accelerated testers at least 5 years before the priority date of the '935 patent.

In addition to the Lu article, ViVitro presented two other references disclosing specific accelerated testers that use compliance chambers: a 1993 manual for the Dynatek M6 accelerated tester ("Dynatek"), and a 1997 Chinese patent publication, CN 1035153C to Xi ("Xi"). These two references are discussed in detail in the section on the invalidity issues.

Dynatek, as shown in the annotated figure below, includes a "capacitance tank" that is partially filled with air (above the "fluid level") to "buffer" pressure changes. APPX1020, APPX1032.



APPX1187-1188 ¶¶ 59–60.

Xi discloses an accelerated tester with air chambers on both sides of the heart valve, as shown below. APPX1195-1199 ¶ 74. Xi expressly teaches that the device "greatly reduce[s] the occurrence of the water hammer effect," APPX1228, the same problem BDC claimed to solve. APPX1183 ¶ 47; APPX1195-1196 ¶ 74. Lu also expressly analyzes and describes the design of Xi. APPX1260.

**APPX1199 (Dasi Declaration annotating Xi FIG. 4)**



APPX1199.

Accordingly, BDC's purported invention of an "excess volume area" was in fact a conventional feature of accelerated testers a decade before BDC filed the '935 patent. And notably, *none* of Dynatek, Xi, or Lu references were considered or cited during prosecution of the '935 patent. *See* APPX0013-0014 (References Cited).

## C.  ViVitro's ADC tester

ViVitro's forthcoming Heart Valve Durability Tester with Automatic Dual Control Technology (the "ADC Tester") is the result of a research and development ("R&D") effort that began around 2020. APPX1160 ¶ 20. ViVitro set out to create

a new accelerated tester that would introduce new features that satisfy the market's desire for more reliable and consistent results. APPX1160-1161 ¶¶ 20-22. Thus, the ADC Tester incorporates new, improved, features that are not covered by the '935 patent and not provided by (and solving issues with) BDC's VDT-3600i product. APPX1161-1163 ¶¶ 22-28. For example, the new ADC Tester physically separates each test chamber and uses closed "rings" to provide compliance in the system (rather than a pressurized chamber), and it employs an automatic control system for more precise control without affecting the valve opening. APPX1161 ¶¶ 25-26.

### D.    Litigation history and preliminary injunction proceedings.

#### 1.    ViVitro denies infringement and provides prior art to BDC during pre-suit communications.

After ViVitro began promoting its forthcoming product, BDC accused ViVitro's ADT tester of infringing BDC's '935 patent. Contrary to BDC's characterization, ViVitro denied the allegations and asserted that two of the three prior art references relied upon here invalidated the claims.

Eventually, BDC filed this action in the District of Colorado. But because the Colorado court lacked personal jurisdiction over ViVitro and BDC declined to consent to transfer the case, ViVitro moved to dismiss the case. APPX0035 (ECF No. 20). The District of Colorado agreed it lacked jurisdiction and transferred the case to the Central District of California. APPX0036 (ECF No. 28). Following an

intra-court transfer in California, the case was assigned to Judge Vera, APPX0038 (ECF No. 64).

### E.  The district court denies the preliminary injunction.

The district court conducted a hearing where it entertained four hours of argument from counsel. See APPX1645, APPX1779. While the district court was unable to "accommodate" BDC's request to "present evidence" because of BDC's insistence on an expedited hearing, the court noted it had "extensively" reviewed the parties' papers, which included declarations from senior executives of both parties and experts. APPX1645. The court denied BDC's motion.

### 1.  The district court initially construes the excess volume area term.

The district court tentatively concluded that the "plain and ordinary meaning" of the excess volume area term is "a compliance chamber that is *separate* and *needs to be fluidly connected*." APPX0010. Noting that the patent describes a compliance chamber that "hold[s] the excess volume" of fluid, the district court reasoned that the claim language reciting the "excess volume area" is "in fluid communication with" the return chamber element "suggests that the excess fluid is going somewhere"—that is, into the compliance chambers that "provide excess volume area for fluid to move into." APPX0006-0007.

## 2.    The district court finds substantial question of infringement.

Applying that tentative construction, the district court found substantial questions as to whether BDC would be likely to show infringement. The court found the alleged elements in ViVitro's outflow chamber were "all connected" and that fluid could not flow into the compliance rings, so reading the claim onto the ADC tester would be "inconsistent" with the patent and claim construction. APPX0006-0007. The district court also concluded that BDC's interpretation in *this case* was inconsistent with its previous characterization of the scope of the excess volume area term during an *inter partes* review (IPR) proceeding defending the validity of a continuation of the '935 patent. APPX0007-0008. In the IPR, BDC argued that mitigating pressure (i.e., providing "compliance") by "material deformation" does not provide a "space" to "store some of the excess introduced fluid," so that it was not an excess volume area. APPX0007-0008 (citing APPX1358). The district court found that ViVitro's ADC tester "works like the competing design" that BDC had distinguished in the IPR, so that "BDC's prior position raises substantial infringement questions." APPX0008.

The district court also rejected BDC's positions that the alleged excess volume area could be *outside* the compliance rings,[3] and that it "can exist only **temporarily**" when the rings are deformed inward. APPX0008-0009; *see also* APPX1660-1661 (BDC arguing compressing the rings "*creates* the excess volume area" (emphasis added)).

Finally, the district court found BDC's claim differentiation "theory" further led it to question the likelihood of infringement. The district court concluded that, interpreting claim 1 to allow the excess volume area to itself be always "within the fluid return chamber," claim 9 would not add anything to the independent claim. APPX0009.

### 3.    The district court finds substantial questions of validity.

Finally, considering the substantial evidence ViVitro presented, the district court made a factual finding that there is a substantial question of validity of the patent, i.e., that BDC had not shown ViVitro's defenses lack substantial merit. APPX0011. Specifically, it found that Dynatek's capacitance tank "appears to include" the claimed excess volume area. APPX0011. It likewise found that Xi "includes an 'air chamber' placed downstream of the device being tested, where

---

[3] BDC describes the "excess volume area" of the patent as always *inside* the bounds of the compliance chamber. *See* Opening Brief at 8 (annotated figure identifying "excess volume of test liquid" within compliance chamber); APPX1331-1332 ("The volume of the excess fluid … is displaced into compliance chambers 135 (in yellow).").

'liquid flows from the test chamber into the air chamber' during operation."
APPX0011; *see also* APPX1769 (BDC counsel: "Xi does have some sort of
compliance chamber. It has that, I agree."). The district court also was not
persuaded by BDC's argument that Dynatek's "see-saw" mechanism was
"'completely different' from the '935 patent," because it found the claims do not
"specify the 'pressure source' that moves the fluid." *Compare* APPX0011 (Order)*,
with* APPX1674, 1676 (BDC arguing Dynatek's "seesaw type of system" does not
anticipate).

As to ViVitro's defense of obviousness over the combination of Dynatek and
Xi, the district court expressed "similar doubts" about validity. While the district
court did not analyze the parties' arguments in depth, it rejected one of BDC's
primary arguments that there was no motivation to combine because Dynatek's and
Xi's mechanisms of action were "completely different" from each other and from
the '935 patent. *Compare* APPX0011, *with* APPX1082.[4]

## IV.    STANDARD OF REVIEW

"A preliminary injunction is a 'drastic and extraordinary remedy that is not
to be routinely granted.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d

---

[4] The district court acknowledged its preliminary factual findings might later
"benefit from future briefing" on whether the asserted prior art could be combined.
APPX0011-0012. But the district court was clear that "Vivitro has raised
substantial questions regarding the patent's validity in light of prior art."
APPX0002.

1319, 1324 (Fed. Cir. 2004). A district court's denial of a preliminary injunction will not be disturbed absent an abuse of discretion. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017); *see also* Opening Brief at 26. A district court abuses its discretion by basing its decision on an error of law or clearly erroneous findings of fact. *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1328 (Fed. Cir. 2018) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).[5] A district court's factual findings, whether made "explicitly or implicitly," can be reversed only for clear error. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1358 (Fed. Cir. 2001).

Claim construction is a legal question generally reviewed de novo, although subsidiary factual findings based on extrinsic evidence are reviewed for clear error. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017). This Court has recognized, however, that there may be "some flexibility" in its review of claim constructions arising from preliminary injunction orders. *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1300 (Fed. Cir. 2013) (citing

---

[5] An appellant's standard on appeal is even higher than this because an "appellant carries a heavier burden when seeking to reverse the denial of a preliminary injunction than seeking to reverse the grant of a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005, 1009-10 (Fed. Cir. 2009) (affirming a finding of substantial question of validity despite finding that the district court made a clear error in examining one of the prior art references).

*Int'l Communication Materials v. Ricoh Co.*, 108 F.3d 316, 318-19 (Fed. Cir. 1997)).

The question of whether a patentee has shown a likelihood of success on the merits—the only preliminary injunction factor at issue in this appeal—is also reviewed for an abuse of discretion. *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1400 (Fed. Cir. 2022). And a district court's factual findings underlying its conclusion that a patent challenger raised a "substantial question" as to infringement or validity are reviewed for clear error. *Id.* (citing *Amazon.com*, 239 F.3d at 1358 (explaining that when assessing the prior art, "the district court necessarily makes fact-findings, explicitly or implicitly," about the prior art that are reviewed for clear error); *see also* Opening Brief at 27.

Such factual findings are clearly erroneous only if, "although there is evidence to support it, the reviewing court … is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022). And under the Ninth Circuit's abuse of discretion standard, even a clearly erroneous factual finding is not itself sufficient to reverse. Rather, the Court will affirm "unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009); *see also Trebro Mfg., Inc. v. Firefly*

*Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (applying Ninth Circuit standard in review of preliminary injunction); Opening Brief at 26 (citing *Trebro*). Thus, "[t]he burden of overcoming the district court's factual findings is, as it should be, a heavy one." *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1559 (Fed. Cir. 1986).

## V.    SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in finding BDC failed to make a clear showing that it was likely to succeed on the merits of its infringement claim.

An accused infringer can defeat the patentee's likelihood of success on the merits if it raises a "substantial question" regarding *either* infringement *or* validity of the claims.

On *infringement*, the district court found that ViVitro raised a substantial question based on its construction of "excess volume area," which BDC posits is the key point of novelty of the patent. The district court did not err in its construction of the excess volume area as a compliance chamber structure for three reasons. *First*, the intrinsic evidence shows that the alleged inventive element is scarcely discussed, and instead only the well-known "compliance chamber" structure, which BDC has also equated with an "excess volume area," provides the function of the previously unknown excess volume area term. *Second*, the district

court properly considered BDC's arguments in a related IPR where it proposed a construction of the same term and distinguished prior art to defend the validity of its claims, especially when the court found that ViVitro's device "works like the competing design from the IPR." *Third*, the Court can interpret the excess volume area as a means-plus-function term. BDC argues that that "nowhere" does its patent require the excess volume area "to have structure," and the plain language of the claim describes the "excess volume area" in primarily functional terms, so that the term is properly construed as limited to the compliance chamber structures disclosed in the patent. If the excess volume area is construed as a structure, there is no dispute that ViVitro's product does not infringe, so the district court did not abuse its discretion in denying the injunction motion.

The district court also did not abuse its discretion in finding a substantial question as to validity. BDC has not shown how the district court clearly erred in its factual assessment of the prior art—which are both accelerated testers with compliance chambers—particularly in view of the well-reasoned expert testimony from ViVitro's expert compared to the often-conclusory testimony of BDC's expert. Further, BDC and its expert used different claim constructions between their infringement and invalidity analyses of the "fluid communication" and "under compression" terms to avoid the invalidity of the claims. These positions are not developed or supported, and the district court's findings that Dynatek likely

disclosed those elements was not clearly erroneous. Likewise, the district court's finding that Dynatek's capacitance tank discloses the excess volume area limitation is not clearly erroneous in light of Dr. Dasi's testimony and the reference itself. BDC's argument that Dynatek directs users to remove air, so that it would not disclose the excess volume area term, is flatly contradicted by additional instructions to "add air" that BDC ignored and the plain view of the figures.

Another reason to affirm is that there are substantial questions as to whether the claims are nonobvious. The Xi reference expressly teaches that it solves the same "water hammer" problem as the '935 patent using the same compliance chamber structures. There is no genuine dispute that Xi and Dynatek disclose all the elements of the asserted claims, and there is ample evidence of a motivation to combine Dynatek and Xi, including the express teachings of multiple accelerated testing devices as solving the well-known water hammer problem using built-in compliance, and the unrebutted testimony of Dr. Dasi as to additional benefits and simplicity of the combination. BDC's contention that Dynatek teaches away from including an air chamber is meritless—Dynatek expressly *directs* the user to "add air" to the capacitance tank. ViVitro presented a strong case of nonobviousness, and the district court's finding of a substantial question of obviousness was not clearly erroneous.

Finally, the district court did not abuse its discretion by "failing" to consider evidence of secondary considerations because BDC did not introduce any competent evidence of that fact. There is insufficient record evidence that BDC's VDT-3600i product even *embodies* the patent, much less to show the required *nexus* between any patented feature and the product. The evidence instead shows that the touted success is attributable to unpatented features. Finally, BDC's claims of copying and industry praise are unsupported.

## VI. ARGUMENT

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1366 (Fed. Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The only element of the preliminary injunction test at issue here is whether BDC made a clear showing that it is likely to succeed on the merits. *See* Opening Brief at 28 (citing preliminary injunction test and noting the "sole focus of this appeal" is likelihood of success).[6]

An accused infringer can defeat a finding of likelihood of success on the merits if it raises a "substantial question" regarding *either* infringement or validity

---

[6] The Court should disregard BDC's superfluous commentary on the question of the irreparable harm factor for injunctions because that issue is not properly before this Court. *E.g.*, Opening Brief at 11-12, 55.

of the patent. *LifeScan*, 734 F.3d at 1366; *Trebro*, 748 F.3d at 1165. Here, the

district court found that ViVitro raised a substantial question about both

infringement and validity. So this Court should affirm if it concludes that *either*

*one* of those factual findings was not clearly erroneous. Far from abusing its

discretion, the district court correctly found that BDC was not entitled to a

preliminary injunction because it had not made a clear showing on either prong of

the likelihood of success analysis.

### A.    The district court properly exercised its discretion in finding ViVitro likely does not infringe.

The district court here carefully considered BDC's claim construction and

infringement arguments in response to the non-infringement defense ViVitro

presented. It correctly concluded that the "excess volume area" term—which BDC

itself argues is the "novel aspect of the '935 patent" (Opening Brief at 10-11)—

cannot mean an amorphous "area" or "space" lacking *any* structure as suggested by

BDC. Opening Brief at 7, 32-33. The district court instead concluded, on the

existing record, that an excess volume area "is a compliance chamber that is

*separate* and *needs to be fluidly connected*." APPX0010. Based on that

construction, the district court found "substantial questions" of infringement had

been raised. While BDC argues on appeal that construction is wrong, it does *not*

argue that the district court abused its discretion in *applying* that construction.

Thus, if this Court concludes the district court's claim construction was not an

abuse of discretion, as it should, then the finding there is a substantial question as to infringement must be affirmed.

**1.    The district court's construction of the term excess volume area is not an abuse of discretion.**

BDC contends the district court's construction was error and posits, instead that an "excess volume area" is "exactly what it says: an area in which excess volume can be stored." Opening Brief at 30.[7] This proposed construction of the limitation is circular, purely functional, and incorrect.

Claim elements are interpreted in the "context of the entire patent" as understood by a person of ordinary skill in the art (POSA) "as of the effective filing date of the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). A POSA would understand that the "excess volume area" must be both an area that is distinct from the return chamber, and "in fluid communication" with the return chamber, as the district court reasonably concluded. Indeed, the excess volume area *is* a compliance chamber.

> *a.    An excess volume area is a separate structure, specifically a compliance chamber as disclosed in the patent.*

The term "excess volume area" must refer to a defined structure in the device because that is the only supported use in the patent. Claim 1 recites an

---

[7] BDC argues, "[n]owhere does the specification require the excess volume area to have structure." Opening Brief at 32-33.

"excess volume area capable of operating at the accelerated pulsed rate, wherein the excess volume area is in fluid communication with the fluid return chamber a volume for storing a volume of a test system fluid when the test system fluid is under compression." The Summary in the specification contains an essentially identical description. APPX0025 at 3:9-12 (differing only in use of "and provides"); APPX0025 at 3:15-18 (repeating function of excess volume area in passive voice). But the patent contains no other disclosure or definition of what an excess volume area would mean to a POSA.

On the other hand, the patent describes *compliance chamber* structures that perform the same "compliance function" that BDC concedes is "described in" the claims.[8] In fact, the only other use of the term "excess volume area" in the Specification is in describing a function or benefit of the compliance chamber structure: "The compliance chambers 135 *provide excess volume area* for fluid to move into when the piston 114 performs a compression stroke." APPX0029 at 12:4-6 (emphasis added)); *see also* APPX0029 at 12:6-9 (compliance chambers "provide additional volume for displacement of the … fluid within the test chamber).

These compliance chambers providing an area or "volume" for excess fluid to flow into are always separate, defined structures in the patent. In one

---

[8] See Opening Brief at 15, 43.

embodiment, the "return chamber 136 *defines* one or more compliance chambers 135 which, … are *composed of cavities* associated with" each test sample. APPX0028 at 9:5-11 (emphasis added). In another disclosed embodiment, "a single compliance chamber 235 is *axially centered over the test chamber* 206 and provides a compliance volume for all of the sample holders 230 in the test chamber 235." APPX0030 at 14:8-11 (emphasis added). The compliance chambers are the *only* structures identified in the patent that perform the compliance function, or the functions recited in claim 1 for the "excess volume area" term.[9]

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315. The specification here lacks any meaningful description of an "excess volume area," instead disclosing compliance chambers *provide* an area for excess fluid volume. BDC contends that a compliance chamber is "one" but "not the only way" to provide excess volume area. Opening Brief at 31 (citing APPX0029 at 12:4-9);[10] *see also* APPX0868 ¶ 7. Glaringly absent, however, is any example of another use or disclosure of something else named an "excess volume area," a point ViVitro raised to the

---

[9] The abstract similarly identifies "[c]ompliance chambers and throttle valves" as what "regulate the pressure gradient and back pressure." APPX0013.

[10] The disclosure cited by BDC merely continues the description of "compliance chamber 135"; it does not propose any alternative "excess volume area."

district court below. APPX1723-1724. It was therefore reasonable for the district court to construe the term in accordance with the invention as actually described in the patent.

While the Court generally cautions against importing a limitation from the specification, there are additional reasons that the district court was correct to construe the "excess volume area" as a separate compliance chamber. First, BDC signaled that it intended "excess volume area" to mean "compliance chambers" in its 2015 Office Action Response in a continuation application. APPX1391 (discussing claimed "excess volume areas (i.e., compliance chamber(s))"); *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) ("i.e." "signals an intent to define the word to which it relates); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017) ("A patentee's use of 'i.e.,' in the intrinsic record, however, is often definitional."). And defining that term for the examiner was useful because nothing in the record—outside the patent itself—suggested there is any established use or meaning in the art of the term excess volume area at the time. In such a case, a term "ordinarily cannot be construed broader than the disclosure in the specification, i.e., the compliance chambers. *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016). In contrast, compliance chambers and the "compliance function" they provide were

"well known" to POSAs in the field of testing artificial heart valves. APPX1388 (BDC Response to Office Action); APPX1257-1261.

Finally, the claims recite the "return chamber" and "excess volume area" separately but they are "in fluid communication" with each other, so there is "a presumption that those components are distinct." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022). Moreover, under BDC's infringement theory, not only is the alleged "excess volume area" in the ADC tester a *part of* the "return chamber," but they are *indistinguishable*. APPX1209-1210 ¶¶ 101-02 (noting Girard "points to the same area he alleges is the fluid return chamber" (citing APPX0917)); Opening Brief at 43 (identifying "space adjacent to the compliance rings" as excess volume area). It would be "nonsensical" to interpret these separately recited elements as "indistinguishable" parts of the same chamber. *See Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020).

That these components are distinct does not mean, as BDC contends that the district court erroneously required "the gas to touch the fluid." Opening Brief at 34. It is undisputed that the patent discloses a membrane may "separate the air or gas from the working fluid." APPX0028 at 9:20-25, APPX0032 at 18:33-35 (claim 10). BDC illustrates how a separate/distinct compliance chamber with the optional

"membrane (red) separates the gas (above) from the fluid (below)," where the "fluid flows into the excess volume area (yellow). See Opening Brief at 10.



In this example, the excess volume area (compliance chamber) is a distinct structure but still "in fluid communication" with the return chamber. So the district court's interpretation does not "exclude the invention" as BDC argues, Opening Brief at 35.

It was also not incorrect for the district court to conclude that claim 1 cannot "always contemplate[]" an excess volume area "within" the return chamber given claim 9 reciting a "cavity within" it. APPX0009. The district court did not interpret the claims to "restrict" the excess volume as "outside" the return chamber, as BDC suggests. Opening Brief at 36-37. The court merely raised the issue as another

reason it found "substantial questions" as what "excess volume area means" and questioned its application to the accused infringing device. APPX0009. BDC's misinterpretation of the district court's order does not render its conclusion incorrect.

> **b.** *BDC's arguments from a related proceeding support the district court's findings.*

BDC's arguments in a Patent Owner Preliminary Response before the PTAB also support the district court's finding that there is a substantial question of infringement. IPR2018-00498 challenged the validity of a continuation of the '935 patent that used the same "excess volume area" language. APPX1315, APPX1351. BDC argued, similar to its position here, that the term meant "a space for storing fluid in excess to the fluid contained in the channel." APPX1351-1353. BDC concluded: "The specification makes clear that *an 'excess volume'* is fluid in excess to that contained in the channel and *an 'excess volume area'* is a place to store it." APPX1353 (emphasis added). This argument suggests the "fluid in excess to the fluid contained in the channel" is "stored" in a "space" that is *not* "in the channel"—i.e., a separate space or structure.

BDC used that construction to argue there was no anticipation by Elizondo, an accelerated tester reference. See APPX1367. BDC argued that Elizondo's "vascular graft" structures were "unlike" the "compliance chamber 135" of the patent because "the pressure to the extent mitigated presumably is *through the*

*deformation of a material*—not by providing *a space in addition to the channel* for storing excess fluid." APPX1368 (emphasis added); *see also* APPX1358. BDC's reasoning supports the district court's and ViVitro's interpretation of the excess volume area term because it shows that, until this case, BDC itself had not viewed *deformation of a material* within the test chamber (i.e., channel) as within the scope of the claim term.

Confronted with its prior statements, BDC argues, without citing any authority, that they are "not binding" because they describe "a different patent and separate art in an abandoned IPR." Opening Brief at 37. This argument is without merit. First, this "different" patent claims priority to the '935 patent, shares a common parent, and uses the *same term*. The claims must therefore be interpreted consistently. *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015). And BDC cannot dispute that a patent owner's statements in an IPR "can be considered for claim construction." *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) (considering patent owner's statements in IPR preliminary response distinguishing prior art, to "inform how the inventor understood the invention" and "clarify[]scope of a claim").

Accordingly, BDC's IPR statements about the scope of the term can and should be considered, and they support interpreting the claim to require a separate

structure and exclude "material deformation" like the compliance rings in ViVitro's ADC tester.

c. *Alternatively, excess volume area should be construed as a means-plus-function term.*

BDC's brief repeatedly asserts that the excess volume area term does not refer to any kind of structure: "Unlike other limitations, which describe structures …, the excess volume area is described using spatial terms: it is an ***area*** or, in three-dimensional terms, a ***volume***." Opening Brief at 30. This area does not have "rigidly defined boundary locations," but is instead a "location" "where fluid can flow." Opening Brief at 31. Indeed, as illustrated by BDC's infringement theory, the element *has no boundary*, much less a rigid one. *See also* Opening Brief at 32-33 ("Nowhere does the specification require the excess volume area to have structure."). These arguments illustrate that the term recited in the claims is a nonce term lacking any structure to perform the recited functions, so it should be construed as a means-plus-function term under 35 U.S.C. § 112 ¶ 6 (pre-AIA) and *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc in relevant part).

The excess volume area term does not recite the trigger-word "means," so there is a rebuttable presumption that § 112 ¶ 6 does not apply. *Williamson*, 792 F.3d at 1349. ViVitro can overcome that presumption by demonstrating the term "fails to recite sufficiently definite structure *or else recites function without reciting*

32

*sufficient structure for performing that function*." *Id.* at 1348 (emphasis added) (cleaned up). The Court asks whether a POSA would understand the claim term "to have a sufficiently definite meaning *as the name for* structure." *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019) (emphasis added).

The "excess volume area" effectively acts as a nonce word—as a substitute for "means"—because the claim describes, in circular fashion, only what it *does*. As posited by BDC, and colorized by ViVitro to illustrate:

> Claim 1 itself provides a description of "excess volume area," stating that it is an area "capable of operating at the accelerated pulsed rate" and that it provides a "volume for storing a volume of a test system fluid when the test system fluid is under compression."

Opening Brief at 30 (citing APPX0032 at 17:45-50). That is, an "excess volume area" is merely an "area" where "excess volume" is stored. This circular description is meaningless. And while the claim recites the excess volume area is "in fluid communication with" the return chamber structure, a term that is "primarily, but not entirely, functional" may still be governed by § 112 ¶ 6. *MTD Prod.*, 933 F.3d at 1343. The term here is primarily functional.

Nor does the record suggest the term "excess volume area" has a definite meaning in the art "as the name for" a structure. *MTD Prod.*, 933 F.3d at 1341. First, BDC itself argues, "*Nowhere* does the specification require the excess volume area to have a structure." Opening Brief at 32-33 (emphasis added).

33

Second, no prior art in the record shows a use of the phrase. In contrast, for example, *compliance chamber* is a "well known" name for a class of structures. APPX1388; APPX1364 ("[BDC] recognized, during prosecution, that compliance chambers were used in hydrodynamic testing systems."); APPX1370 (describing compliance chambers in two references, Pickard and Iwasaki); APPX1261 (Lu reference using "compliance chambers" as name for Xi's air chambers structures).

Nor do the experts suggest an excess volume area is a name for a structure. BDC's expert asserted that the term is "readily understandable" to a POSA and should be given its plain meaning, APPX0911-0912 ¶ 20, but he did not proffer a meaning or refer to any structure. He only stated it was a "location" occupied by gas. APPX0925-0926 ¶ 34. Girard also tried to distinguished Xi's compliance chamber by referring to its *function* rather than any *structural* difference. APPX0931 ¶ 52 (contending it "serves a different purpose than the excess volume area").

Dr. Dasi understands the term "excess volume area" as limited to a compliance chamber, based on the term's use by BDC. APPX1174 ¶ 18 (noting the inventor and expert both "characterize the '935 patent as an improvement … because *it uses a 'compliance chamber' or 'excess volume area'* to prevent 'pressure spikes'"). Dr. Dasi explained the references "all show that the use of excess volume areas was a well understood and conventional feature." APPX1177

¶ 24. Thus, while referring to the *structure* of the compliance chamber, Dr. Dasi explained that a POSA would understand the excess volume area—i.e., compliance chamber—to be a structure. APPX1206-1207 ¶¶ 95-96. ViVitro's expert did not contend the term excess volume area has a well understood *meaning* but that a POSA would understand the term excess volume area to have *the structure of a compliance chamber*. APPX1206-1207 ¶¶ 95-96. Thus, neither party proffered any accepted meaning in the art for the term "excess volume area."

For these reasons, § 112 ¶ 6 applies to the "excess volume area" limitation, and it should be construed to cover, at most, the structure (and equivalents) in the specification—the compliance chambers.

### d. The proposed construction does not conflict with claim differentiation doctrine.

BDC argues the district court's construction "render[s] meaningless any distinction between 'compliance chamber' and 'excess volume area,'" under the doctrine of claim differentiation. If claim 9 only recited, "the excess volume area is a compliance chamber," this argument might hold some weight. But claim 9 includes other details: the "compliance chamber [1] defin[es] a cavity [2] within the fluid return chamber." These additional limitations are absent from claim 1, so claim differentiation does not presume a different scope for the excess volume area term. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325-26 (Fed. Cir. 2001). And, in any case, the doctrine only raises "a rebuttable

35

presumption that may be overcome by a contrary construction dictated by the written description or prosecution history," which ViVitro has shown above. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016).

### 2. Applying the proposed construction of excess volume area requires affirmance.

BDC's sole argument that the district court abused its discretion in finding a substantial question of infringement is that it incorrectly construed the excess volume area term. It does *not* argue any basis to reverse under the district court's (correct) interpretation. There is no dispute that the ADC tester does not infringe under a construction requiring a separate compliance chamber (or equivalent) structure. Accordingly, if this Court agrees with this interpretation of the excess volume area, then the infringement finding should be affirmed. *Saeilo Inc. v. Colt's Mfg. Co.*, 26 F. App'x 966, 972 (Fed. Cir. 2002) (affirming grant of summary judgment of noninfringement when the patentee did not attempt to argue that infringement was possible under the court's proper claim construction); *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1075 (Fed. Cir. 2008) (affirming denial of injunctive relief when noninfringement was undisputed under the district court's correct claim construction).[11]

---

[11] If this Court agrees with BDC that an excess volume area is merely an "area" where fluid can flow without any structure, then that broad construction makes ViVitro's invalidity positions even stronger and confirms there is at least a substantial question as to validity.

### 3.     Regardless of the construction of excess volume area, the district court's finding of substantial question of infringement should be affirmed.

On the other hand, if this Court agrees with BDC's proposed construction of the "excess volume area" requiring a "net compression" or "overall force" on the system then it should also affirm because BDC's infringement case fails for a lack of proof. Girard's infringement analysis did not consider—or even mention—the claims requiring "net compression" or "overall force" on the test system. He only applied *that* interpretation for his *invalidity* analysis, to arrive at the conclusion that Dynatek does not disclose "net compression." APPX0928. For infringement, Girard merely asserts that there is compression of the "test fluid" in ViVitro's accused product; he does not allege or reference any "net compression" or "overall force" generated by ViVitro's system. APPX0918 (element [1f]).

In short, BDC failed to use its proposed claim construction requiring the test system be under "net compression" in performing its infringement analysis. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("[C]laims are construed the same way for both invalidity and infringement …."). [12] Consequently, if BDC's claim construction argument prevails, it is not an abuse of discretion to find no likelihood of success of infringement. *See Golden v. Apple*

---

[12] BDC's brief includes multiple definitions of the claim term "excess volume area." *See, e.g.*, Opening Brief at 30-31. BDC's expert opinion does not rely on any of them. APPX0918.

*Inc.*, 819 F. App'x 930 (Fed. Cir. 2020) ("we 'may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted.'" (quoting *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998))).

### B.    The district court did not abuse its discretion when it correctly found there is a substantial question of validity.

The district court also considered the parties' validity arguments and evidence and properly expressed "substantial doubt" that the claims were valid over Dynatek and Xi. APPX0011. The disclosures of Dynatek and Xi (and Lu), combined with BDC's admissions in the record, show that all features of the '935 patent, were known in the art. And the record includes ample evidence, from both the art itself and Dasi's declaration, that would motivate a POSA to combine the art. BDC failed to show the asserted defenses lack substantial merit, so the district court correctly found that ViVitro raised a substantial question of validity. At minimum, that finding is not clearly erroneous given the cited evidence.

### 1.    Legal standards specific to likelihood of success on the merits and patent validity.

An alleged infringer presents a substantial question of validity when it presents an "invalidity defense that the patentee cannot prove 'lacks substantial merit,'" *BlephEx*, 24 F.4th at 1399. The burden is then "on the patent owner to present contrary evidence to 'persuade the court that, despite the challenge

presented to validity, the patentee nevertheless is likely to succeed at trial on the

validity issue.'" *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, 785 F. App'x

871, 874 (Fed. Cir. 2019) (quoting *Titan Tire Corp. v. Case New Holland, Inc.*, 566

F.3d 1372, 1377 (Fed. Cir. 2009)).

While BDC highlights the ultimate standard of proof for trial, Opening Brief

at 44, showing a substantial question of invalidity "requires less proof than the

clear and convincing showing" that applies at trial. *Entegris, Inc. v. Pall Corp.*, 490

F.3d 1340, 1351 (Fed. Cir. 2007) (quoting *Amazon.com*, 239 F.3d at 1350).

"Vulnerability is the issue at the preliminary injunction stage," not whether the

patent is invalid under the clear and convincing evidence standard. *Amazon.com*,

239 F.3d at 1358-59.

### 2. The district court's finding of likely anticipation was not clearly erroneous.

ViVitro presented substantial evidence that each element of asserted claims

1, 2, 8, and 13 was disclosed by Dynatek and supported this conclusion with expert

testimony. APPX1186-1194 ("Dynatek anticipates claims 1, 2, 8 and 13 of the '935

patent"). FIG. 1 of Dynatek (annotated below) shows that it discloses each element

of the '935 patent claims:

**Annotated Dynatek FIG. 1A (Appendix 1188, Dasi Declaration)**



Dasi explains that the capacitance tank discloses the claimed excess volume area because it buffers pressure changes by providing a space in fluid communication with the test chamber (including the return chamber) through the tygon tube. APPX1187-1191 ¶¶ 58-59, 66-67. Dasi corroborates this opinion with his own experience observing fluid flow into the capacitance tank of a Dynatek M6 during operation. APPX 1191 ¶ 67. Thus, Dasi's declaration shows that a POSA would find that Dynatek anticipates claim 1. Dasi further opines that dependent claims 2, 8, and 13 are disclosed by other features of Dynatek. APPX1186-1194.

The district court's finding that Dynatek likely anticipates 1, 2, 8, and 13 is therefore not clearly erroneous because it is supported by the plain language of Dynatek and ViVitro's well-reasoned expert analysis. *See* APPX0011 (finding "Dasi's declaration supports" anticipation). Anticipation is a question of fact, so that finding is reviewed for clear error. *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010).

BDC raises three arguments to challenge the anticipation finding: (1) Dynatek's excess volume area is not "connected" to the return chamber; (2) Dynatek's "test system" is not under compression; and (3) Dynatek's capacitance tank "cannot operate as quickly as required." Opening Brief at 46-49. As set out below, all these points fail. Neither compression of the "test system" nor a direct "connection" between the capacitance tank and return chamber are claim limitations, and Dasi testified that the capacitance tank receives fluid flow during operation of Dynatek's test system. BDC's arguments are incorrect and cannot show a clear error.

> a.    *Dynatek discloses fluid communication between an excess volume area and a return chamber.*

First, BDC repeats the argument that Dynatek does not include an excess volume area "in fluid communication with the fluid return chamber" because the tube connects Dynatek's capacitance tank (the "excess volume area") to the distribution chamber. Opening Brief at 46. However, the unrebutted (and common-

sense) evidence from Dasi is that the term "fluid communication" is not limited to directly touching components. Instead, to a POSA, fluid communication "means that fluid can move from a point inside a first volume to a point inside a second volume." APPX1195 ¶ 74; *cf. In re Liquid Dispensing Sys. Patent Litig.*, No. 1:18-MD-02832-KMM, 2019 WL 12023099, at *6 (S.D. Fla. Dec. 16, 2019) (plain meaning of "being in fluid communication" was "connected in a way that allows fluid to flow from one location to another location"). In other words, "fluid communication" simply means that fluid can flow from one place to another, whether indirectly or directly. Dasi testified that because fluid can flow through Dynatek's test system (which includes a return chamber) to the capacitance tank, Dynatek discloses "fluid communication" between a return chamber and an "excess volume area." APPX1191 ¶ 66.

Instead of offering an opposing definition of "fluid communication" for the Court, perhaps because they could not, BDC's brief (and expert) make the naked assertion that Dynatek does not disclose fluid communication. Opening Brief at 46-47. The closest BDC has come to proposing an alternative definition of "fluid communication" is arguing to the district court that components "in fluid communication" must "touch each other." APPX1767 ("you would think those have to communicate, touch each other. And that's all that it means."). But BDC's "touch each other" definition is inconsistent with (1) the disclosure of the '935

patent; and (2) BDC's own arguments in the present brief, as well as common sense.[13]

Claim 1 of the '935 patent recites "a fluid distribution chamber … in fluid communication with the pressure source." But the only cutaway views shown in the drawings, FIGS. 3 and 6, show the "distribution chamber" and "piston" (i.e., pressure source) as separated by a plenum, base plate, and drive adapter. APPX-0026-0027 at 6:61-7:50. An annotation of FIG. 3 of the '935 patent, below, shows how the claimed "distribution chamber 126" is not "touching" the piston pressure source.[14]



**'935 patent FIG. 3 Annotated**

---

[13] Parts clearly can be in fluid communication with an indirect connection. The '935 patent specification describes how sensors can be "attached directly," (APPX0028 at 10:62) if the drafter intended to claim only "direct attachment" the drafter would have used a phrase like "attached directly" in the claim.

[14] Regardless of whether the piston, cylinder, and/or drive adapter are considered the "pressure source," they are not "touching" the distribution chamber.

Generally, claims are not interpreted "in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (collecting cases). So the fact that the '935 patent claims recite "fluid communication" between components (like the distribution chamber and pressure source) that are not touching each other is strong evidence that "fluid communication" does not require "touching." *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998) ("[T]he same word appearing in the same claim should be interpreted consistently.") Thus, BDC's proposed construction of "fluid communication" as "touching" is disproved by the '935 patent disclosure. Bolstering this conclusion, the '935 patent explains that: "Connection references … are to be construed broadly and may include intermediate members between a collection of elements … [a]s such, connection references do not necessarily infer that two elements are directly connected." APPX0032 at 17:3-8.

BDC's brief concedes that Dynatek discloses that the "capacitance tank *is in fluid communication with* the distribution chamber." Opening Brief at 46 (emphasis added). But the capacitance tank in Dynatek is plainly not "touching" the fluid distribution chamber; it is connected via a length of tubing. Opening Brief at 47 (Dynatek FIG 1A, showing the tygon tubing). Thus, BDC itself concedes that "fluid communication" is present even when two structures (the capacitance tank

and distribution chamber) are connected by intermediate pieces (the tube) and therefore not actually "touching."

In sum, it is undisputed that fluid can flow from Dynatek's test chamber to Dynatek's capacitance tank. See Opening Brief at 24 ("The capacitance tank is connected to the test chamber"). It is also undisputed that Dynatek's test chamber includes both a distribution chamber and return chamber that fluid can flow between. See Opening Brief at 47 (approvingly citing ViVitro's annotated Dynatek Figure, including fluid flow arrows between the distribution and return chamber). Thus, Dynatek discloses that fluid can flow from a point inside Dynatek's "capacitance tank" (the excess volume area) to a point in the "return chamber" by passing through the tygon tube and distribution chamber. Therefore, it was not clearly erroneous for the district court to implicitly find that Dynatek's capacitance tank discloses an excess volume area "in fluid communication with" the return chamber. APPX1191 ¶ 66.

> b.    *BDC's argument that the entire claimed "test system" must be "under compression" is not supported by the claim language or specification.*

BDC's second point retreads the argument that "Dynatek does not anticipate, because its "test system fluid is never 'under compression.'" Opening Brief at 48. But the *first page of Dynatek* states: "A swashplate drive is used to *compress* six bellows" and "bellows compression *increases the pressure* behind the valve."

APPX1018 (emphasis added). Dynatek also expressly discloses that "valve closure loading pressure (closing pressure) is a function of speed, [and] the magnitude of the bellows compression." APPX1036.

Thus, Dynatek plainly discloses that its "test system fluid" is "under compression" as recited in the claim. APPX1191 ¶ 66. And BDC conceded at the hearing that Dynatek discloses pressure (i.e. compression) on the test fluid: "in Dynatek… as this side [of the tester] could be creating pressure … you're going back and forth … moving the fluid around." APPX1680.

Since Dynatek plainly discloses a system that can compress the test fluid, BDC argues that claim 1 should be read to require compression on the "test system" instead of the "test system fluid." Opening Brief at 47-48. But the plain language of claim 1 does not recite compression on the entire "test system," only the "test system *fluid*." APPX0032 at 17:49-50 (emphasis added). Similarly, the Specification describes the "test system fluid is under compression," not the overall system. APPX0025 at 3:9-12. Thus, BDC's arguments about whether Dynatek discloses "overall force in the system" or "overall volume" are irrelevant to the actual claim language.[15] BDC made similar arguments to the district court, describing Dynatek's swashplate as a "see-saw" and arguing that the mechanism

---

[15] BDC makes essentially the same argument against Dynatek in its obviousness section, but there characterizes this alleged requirement as "net compression." See APPX0928.

providing pressure was "completely different" from the claimed invention.

*Compare* APPX0011, *with* Opening Brief at 47-48. The district court correctly

rejected these arguments, noting that the plain language of the '935 patent claim 1

recites only "a pressure source." APPX0011 ("the '935 patent does not specify the

'pressure source'").

> c.   *The record supports the finding that Dynatek discloses a capacitance tank capable of operating as a compliance chamber at an accelerated rate.*

Third, BDC argues that Dynatek's capacitance tank "cannot operate as

quickly as required" and therefore does not meet the "excess volume area"

limitation. Opening Brief at 48.

There is no dispute that Dynatek discloses an accelerated test system. So,

Dynatek's accelerated test system, including its capacitance tank "operates" at an

accelerated rate. APPX1191 ¶ 66. Dr. Dasi's unrebutted testimony is that he has

witnessed fluid flow during this operation. APPX1191 ¶ 67.[16]

Nevertheless, BDC argues that Dynatek's capacitance tank fails to meet the

"excess volume area" claim limitation because it allegedly only addresses "small

variations" in system pressure or because it is not "designed to address" pressure

variations in "every cycle." Opening Brief at 48. But nothing in claim 1 requires

---

[16] It was not clearly erroneous for the district court to infer from the evidence that Dasi witnessed the Dynatek accelerated tester operating at an accelerated rate. APPX1745-1746.

the "excess volume area" to absorb any specific amount of pressure or receive a

certain amount of fluid. The '935 patent is silent on these parameters, and BDC has

never explained what rate of flow, amount of flow, or pressure change the excess

volume area must be capable of to meet this claim limitation. Moreover, Girard's

testimony on these points is conclusory and unsupported (APPX0929-0930 ¶ 48),

while Dasi's testimony is that Dynatek's capacitance tank operates as an "excess

volume area" based both on the express disclosure of Dynatek and his personal

observations of the device in operation. APPX1191 ¶ 67. Dynatek expressly states

that the capacitance tank "buffers" changes in pressure while the system is

operating. APPX1039; see also APPX 1191 ¶ 66. The district court's assessment of

Dynatek's teachings, in conjunction with the experts' declarations, is not clearly

erroneous. Finally, the purpose of Dynatek's capacitance tank is irrelevant to

anticipation because patentability "depends on the claimed structure, not on the use

or purpose of that structure." *In re Chudik*, 706 F. App'x 670, 672 (Fed. Cir. 2017)

(quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809

(Fed. Cir. 2002)).

BDC next argues that the Dynatek reference "teaches away" from an excess

volume area, citing steps of Dynatek's setup instructions describing how to remove

air from parts of the Dynatek system. Opening Brief at 49. This argument is

meritless for two reasons. First, "teaching away" is irrelevant to anticipation. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

Even more, BDC's argument ignores, and is refuted, by the *rest* of the Dynatek instructions. Steps 34-35, 40-41, 43, and 45 instruct users to *add air* to pressurize the capacitance tank. *See e.g.*, APPX1027-1029;[17] APPX1191 ¶ 66 (testifying the tank "is partially filled with a fluid, and the top of the tank is empty and thus contains air").[18] Dynatek FIG. 1A depicts the capacitance tank with air above the "fluid level":



---

[17] For example, Step 41: "Open the stopcock, add air and close the stopcock to refill the syringe with air."

[18] ViVitro noted BDC's glaring omission during the injunction hearing. APPX1748-1749.

APPX1192. It was correct, not clearly erroneous, for the district court to reject

BDC's selective citation to a portion of Dynatek's instructions.

> d.    *ViVitro challenged the validity of all asserted claims, so it is irrelevant that ViVitro challenged only four as anticipated.*

Fourth and finally, BDC argues that Dynatek only anticipates half of the

asserted claims, so the other claims are "unchallenged" and "infringed." This

argument is meritless—ViVitro challenged all asserted claims as obvious over

Dynatek and Xi *and* disputed infringement. See APPX1131-1141. The district

court recognized ViVitro's obviousness and infringement challenges when finding

BDC had failed to show a likelihood of success on the merits. APPX0009-0012.

**3.    The district court correctly found there is a substantial question of validity as to obviousness over Dynatek, alone or in combination with Xi.**

ViVitro also presented evidence and expert testimony that all asserted claims

were obvious over the combination of Dynatek and Xi. See APPX1195-1204;

APPX0011. That evidence included the unrebutted testimony of Dasi that the

combination of Dynatek and Xi contains all the elements of the asserted claims and

that a POSA would be motivated to combine Dynatek and Xi to obtain "a tester

with fewer parts that would be easier for an end user to assemble, setup, and

transport." APPX1200 ¶ 76.

Moreover, the record shows that Xi discloses what Weinberg and Girard themselves characterize as the invention—a "downstream" or "outflow side" excess volume area. APPX0868 ¶ 6; APPX0909 ¶ 14. Xi expressly teaches that it solves the same "water hammer" problem in an accelerated tester as BDC claims the '935 patent later addressed. *Compare* APPX1228, *with* Opening Brief at 7. Dasi opined that Xi's compliance chamber is downstream of the valve being tested in Xi and provided supporting annotations. APPX1196 ¶ 74.



Thus, the district court had ample evidence to find "substantial doubt" exists as to whether the claims are nonobvious over Dynatek alone or over the combination of Dynatek and Xi. APPX0011.

In addition to ViVitro's evidence, BDC's own admissions confirm that *every element* of claim 1 was known in the prior art:

- BDC cannot dispute that both Dynatek and Xi disclose accelerated test systems with "pressure sources" and "test chambers." Opening Brief at 52 (BDC disagreeing with *labeling* of some elements but not their presence).

- BDC concedes that Dynatek discloses a "fluid return chamber" and "fluid return chamber." Opening Brief at 54 (referring to "the fluid return chamber" in Dynatek); Opening Brief at 47 (referring to "fluid distribution chamber" in Dynatek). BDC also concedes that Xi discloses "a distribution chamber." Opening Brief at 52 (BDC annotation of Xi).

- BDC does not dispute that the prior art discloses "return conduits" (*see generally*, Opening Brief).

- BDC agreed that Xi has a "compliance chamber," which it admits is "[o]ne type of 'excess volume area.'" APPX1769; APPX0868 ¶ 7.

Thus, there is no real dispute that all elements of the claims are disclosed in Dynatek and Xi. BDC's arguments against §103 invalidity mischaracterize the district court's order, attack the references individually, and ignore the clear motivations to combine found in the record. The district court did not abuse its discretion in concluding that a POSA would have found each of the asserted claims obvious over Dynatek and Xi.

*a.    BDC's re-interpretation of the Court's order lacks merit.*

As an initial point, BDC mischaracterizes the order by contending that the district court's "holding [was] that ViVitro has failed to prove sufficient evidence of a motivation to combine, and thus has failed to meet its burden. BDC also posited that the district court "did not … base its [obviousness] ruling on Xi" Opening Brief at 50.

BDC's characterization is not even close to the district court's actual "holding." What the district court said was that it had "doubts … for the concept of obviousness," and it would "benefit from future briefing to determine *whether the teachings of Xi, Dynatek, and Lu could have been combined*." APPX0011-0012 (emphasis added); *see also* APPX0011 ("Vivitro asserts that 'the '935 Patent claims are all obvious variations on Dynatek and Xi, and so all the asserted claims are invalid as obvious.'"). The district court plainly understood ViVitro's obviousness challenge; it was simply not persuaded by BDC's rebuttal. BDC's argument that the district court did not understand its own order is without merit. Instead, the district court's statements that BDC would have future opportunities to brief these issues were simply correct statements that the case would proceed in ordinary course after the preliminary injunction denial.

> b.  *BDC's arguments against Dynatek and Xi are wrong, and fail to identify any clearly erroneous factual finding or other abuse of discretion.*

BDC raises four arguments why Dynatek and Xi do not render the claims obvious. All four arguments fail. There is substantial evidence that a POSA would have found it obvious to combine Xi's compliance chamber with Dynatek's system. APPX1195-1200 ¶¶ 73-75.

> (i)  Xi discloses air chambers on both sides of the valve being tested.

First**,** BDC argues that Xi's air chamber is "connected on the wrong side of the valve." Opening Brief at 17. BDC completely ignores that Xi discloses multiple *air chambers* on *both sides* of the valve.[19] See also APPX1261 (Lu describing Xi's "large common compliance" and "small compliance.")[20]

---

[19] BDC's brief does not even mention Xi's "large air chamber" and crops each picture of Xi so that the reference number "12" for the large air chamber in Xi FIG. 4 is omitted. Opening Brief at 51-52.

[20] Xi's "large common compliance" serves all test chambers just like the single compliance chamber 235 in FIG. 6 of the '935 patent.

**APPX1199 (Dasi Declaration annotating FIG. 4 of Xi)**



Dasi's unrebutted testimony is that Xi's "air chamber" and "large air chamber" disclose compliance chambers on both sides of the valve being tested in Xi. APPX1195 ¶ 74-76 (Dasi Declaration). And BDC Counsel conceded that Xi discloses a compliance chamber. APPX1769. So, no matter which side of the Valve BDC labels the "distribution chamber" and "return chamber," a POSA would understand that a compliance chamber—whether Dynatek's capacitance tank or Xi's air chamber—could be connected to either side of the valve disclosed in Dynatek based on Xi's teaching of placing air chambers that provide excess volume on both sides of the valve being tested. APPX1195 ¶¶ 74-76.

BDC's argument about the position of the "air chamber" also fails because it attacks Xi in isolation and does not consider whether positioning the air chamber at different locations in the test system would be *obvious* to a POSA. *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references.") Dynatek discloses a "capacitance tank" that is attached upstream of the valve being tested, and Xi discloses air chambers both upstream and downstream of the valve being tested. APPX1195-96 ¶ 74. Thus, a POSA would have found it an obvious modification to connect the compliance chamber to *either* the upper head or lower head of Dynatek. APPX1195-1196 ¶ 74. Combining features of Xi and features of Dynatek to arrive at the invention claimed by the '935 patent would have required no more than "simple substitution" within the skill of a POSA. APPX1200 ¶ 76. Moreover, BDC's arguments about the positioning of the chamber ignore the fact that there is no requirement that references be "bodily incorporat[ed]" into one another to render a claim obvious. *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950 (Fed. Cir. 2023), at *5 (Fed. Cir. July 10, 2023) ("[A POSA] may be motivated to combine particular features of different references … even when bodily incorporation would be impossible").

Finally, BDC's argument that the "air chambers" of Xi are connected to what would be Xi's "distribution chamber" is incorrect. The '935 patent uses the term "distribution chamber" to refer to the upstream side of the valve, and "return chamber" to refer to the downstream side of the valve. *See* APPX1195-1196 ¶ 74.[21] Consistent with this, BDC argues that the innovation of the '935 patent is "providing an excess volume area on the *outflow side* of the valve." APPX0868 ¶ 6 ("I developed a novel test system that placed an excess volume area on the outflow side of a test sample valve."); Girard Dec. APPX0909 ¶ 14 ("the excess volume area is able to store the excess volume downstream of the prosthetic test valve."). Comparing Xi's FIG. 4 to '935 patent FIG. 3 shows that Xi's air chamber and BDC's "excess volume area" (the compliance chamber 135) are both on the downstream/outflow side of the valve being tested—disclosing what BDC alleged is the novel feature of the '935 patent.

---

[21] In other words, the fluid is *distributed* to the valves, and then returns through the return chamber.

**'935 patent FIG. 3, annotated (APPX1197)**



**Xi FIG. 4, annotated (APPX1198)**



Thus, Xi discloses an excess volume area forming a cavity in the return chamber, because Xi's "air chamber" is on the downstream/outflow side of the valve, as shown by the flow arrows in the above Xi FIG. 4. APPX1196 ¶ 74. The district court was correct to conclude that Xi "includes an air chamber placed downstream of the device being tested, where liquid flows from the test chamber into the air chamber' during operation." APPX0011 (cleaned up); *see also* APPX1229-1230. BDC again fails to identify clear error with the district court's understanding or interpretation of these facts.

> (ii)     There is ample evidence of a motivation to combine.

Second, BDC argues that ViVitro "cannot articulate" a motivation to combine. Opening Brief at 52.[22] BDC's argument misstates the record. ViVitro presented *substantial evidence* to the district court of motivation to combine, including Dasi's declaration and the references themselves. APPX1200 ¶ 76 (Dasi describing the motivation as creating a "tester with fewer parts that would be easier … to assemble, setup, and transport)); APPX1140 (ViVitro Opposition Brief citing Dasi Dec.); APPX1773 (oral argument that the prior art itself motivates a POSA to use compliance chambers to absorb pressure).

---

[22] BDC claims that this was "recognized by the district court," but its citation for this "recognition" by the district court *is its own expert declaration*—not the district court's order.  Opening Brief at 52 (citing APPX0931-0932 ¶ 55).

Further, BDC itself has admitted that the problem of pressure spikes (water hammer) was known in the art. See APPX1329; APPX1388-1389; Opening Brief at 6. And the cited prior art teaches known solutions to the known problem, even in *accelerated* testers. Air chambers like Xi's prevent water hammer effects in accelerated testers. Water hammer effects can occur when valves (like the heart valves being tested in Xi and Dynatek) close repeatedly during the test. APPX1258 ("At the instance of valve closing, the water hammer effect due to reversed fluid flow increases downstream pressure."). The prior art also teaches the solution to the known problem of water hammer in accelerated testers: "the water hammer effect can be reduced with a built-in compliance." APPX1257; APPX1175 ¶ 21 ("'water hammer' … can be solved by adding an excess volume of air to the sealed fluid system…"); APPX1175-1176 (noting "devices to prevent water hammer are routine plumbing parts" in the prior art). If, as BDC suggests, Dynatek's capacitance tank did not function as a compliance chamber, then a POSA would have been motivated by the teachings of the art, Xi and Lu at a minimum, to add one. E.g., APPX1256 (disclosing *all* of the then-current accelerated testers in the market had "adjustable … compliance," which reduces "the water hammer effect").

Thus, a POSA would be motivated to include a compliance chamber, as in Xi and further describe in Lu, in an accelerated tester (including the Dynatek

accelerated tester) to address the water hammer effect. Thus, BDC's arguments that ViVitro cannot articulate motivations to combine are unsupported by the record. At the very least, it was *not clearly erroneous* for the district court to "doubt" the nonobviousness of the '935 patent's in view of those teachings or to implicitly find a motivation to combine.

To try to show that no motivation to combine exists, BDC argues that (1) the systems of Dynatek and Xi operate in "fundamentally different" ways, and (2) Dynatek teaches away from including Xi's air chamber because of "numerous warnings" to remove air. Opening Brief at 52-53. Neither point is persuasive.

As to the drive mechanisms, the district court correctly observed that the patent (like the claims) "does not specify the 'pressure source' that moves the fluid," and it expressed "substantial doubt" as to BDC's validity arguments based on that fact. APPX0011. Both Xi and Dynatek disclose "pressure sources" that cause fluid to move through the valves, and substituting different known drive mechanisms was well within the level of skill in the art. APPX1202 ¶ 80 (explaining that a POSA would was capable of substituting "rotating vs. linear motors" to obtain the predictable result of "moving a bellows up and down.").

Nor does Dynatek teach away from using air, or a compliance chamber, in a heart valve test system. As noted above, BDC omits that Dynatek *affirmatively directs* the user to "add air" to the capacitance tank as one of the final steps in

61

operating the Dynatek tester, APPX1028-1029 (Steps 41-45 including adding air to pressurize the capacitance tank), so it cannot be read to criticize, discredit, or otherwise discourage" adding a compliance chamber with air. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Finally, there is no requirement that the combination of Xi and Dynatek be the "best" solution. *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014) ("Our precedent, however, does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away.").

Thus, both Dynatek's "capacitance tank" and Xi's "air chamber" disclose excess volume areas in accelerated test systems that can buffer pressure changes. APPX1191 ¶ 66, APPX1195-1196 ¶ 74. Dasi's unrebutted testimony is that Xi's air chamber could be simply substituted into the system disclosed by Dynatek, and that such a combination "would result in a tester with fewer parts that would be easier for an end user to assemble, setup, and transport." APPX1200 ¶ 76. Such motivations are legally sufficient to invalidate claims as obvious. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (upholding summary judgment of invalidity where motivation to combine included "commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost.")

Moreover, BDC's argument that "Dynatek teaches away from Xi" (Opening Brief at 52-53) misunderstands the law. The obviousness inquiry does not ask whether Xi's air chamber would benefit Dynatek's system. *Axonics*, 73 F.4th at 957 ("The inquiry is not whether a relevant artisan would combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims at issue."). Instead, the inquiry is whether a POSA would have been motivated to combine the features "to achieve the claimed invention." *Id.* (cleaned up). Since ViVitro presented expert testimony that a POSA would be motivated to modify Dynatek's system by using Xi's air chamber that forms a cavity in the return chamber, and thereby arrive at the claimed invention *of the '935 Patent*, the district court's conclusion that the claims are obvious is not an abuse of discretion.

> (iii)  BDC's arguments about incorporating Xi into Dynatek are based on misinterpretations of the claims, an incorrect obviousness analysis, and ignore the motivations for the combination identified by ViVitro.

Third**,** BDC argues that if a compliance chamber were incorporated into Dynatek, it would not function as an "excess volume area" because Dynatek allegedly lacks "net compression." This argument is essentially the same one BDC presented for its anticipation rebuttal, and it fails for the same reasons. As argued in Section VI.B.3.b(ii), "net compression" is not required by the term excess volume

area (and is not even mentioned in the '935 Patent). So whether Dynatek alone

lacks "net compression" is irrelevant to whether the POSA would find the '935

Patent claims obvious over Dynatek and Xi. See Section VI.B.2.b. Regardless,

ViVitro showed that a POSA would be motivated to use Xi's air chambers with

Dynatek's accelerated test system to obtain the '935 Patent claims. APPX1200

¶ 76. At the very least, it was not clearly erroneous to so find.

> c.    *BDC failed to show the required nexus between the claim language and any alleged secondary considerations.*

Last, BDC faults "the district court (and ViVitro)" for failing "to address

secondary considerations of nonobviousness." Opening Brief at 54. However, BDC

has the burden of presenting sufficient evidence to demonstrate *a nexus* between

any asserted secondary consideration and the claimed invention, *Prometheus*

*Lab'ys, Inc. v. Roxane Lab'ys, Inc.*, 805 F.3d 1092, 1101 (Fed. Cir. 2015), and

BDC failed to meet that burden.

Secondary considerations will only be accorded "substantial weight" if there

is a sufficient "nexus" between the secondary considerations and the claimed

invention. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1360 (Fed.

Cir. 2021). The evidence needs to be "tied to a specific product and that product

'embodies the claimed features, and is coextensive with them.'" *Id.*

"Coextensiveness" is a question of fact. *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d

1366, 1373 (Fed. Cir. 2019). BDC presented **no** evidence of coextensiveness.

BDC's brief vaguely references "substantial and compelling" evidence of nonobviousness with nary a citation to evidence. Opening Brief at 55. BDC argues that the success of its system is strong evidence of nonobviousness, but failed to show the claimed success is due to the patented features—much less the "excess volume area."

It is not even clear that VDT-3600i product "practices the '935 patent," as BDC contends, Opening Brief at 11, The product images bear little resemblance to the embodiments depicted in the patent. *Compare* APPX1478 (VDT-3600i, shown below)*, with* APPX0015, APPX0020 (Figs. 1 and 6).



**Fig. 1**

Mr. Mouneimné noted these differences (APPX1158-1159 ¶¶ 16-17), yet BDC still failed to show that the VDT-3600i embodies the patent. Their only

purported evidence is a conclusory reference by Weinberg to "BDC's ground-breaking invention, embodied in the VDT-3600i." APPX0874 ¶ 28. There is no record evidence to support a finding that the VDT-3600i includes all the limitations of any claim. Thus, BDC cannot show the required nexus to supports any secondary considerations argument.

And evidence shows that *unpatented features* drove demand for the VDT-3600i. ViVitro's President explained, without rebuttal, that customers gravitated to the VDT-3600i because of its SDM architecture, where an independent motor is provided for each test sample—a feature not covered by the '935 patent—and other commercial factors. APPX1157-1159 ¶¶ 13-14, 16.

Weinberg's declaration also suggests that the touted excess volume area does not drive demand; he lists several *other* factors that caused consumers to prefer BDC's VDT-3600i product over ViVitro's earlier product. APPX0870 ¶ 12. And BDC's marketing brochure makes *no mention* of that feature. APPX1478.

BDC also asserts "industry praise and copying" but cites *no evidence*. BDC makes the bare argument that "ViVitro mimicked BDC's service offerings," Opening Brief at 55, but there is zero evidence to support the required showing that

ViVitro "replicat[ed]" the VDT 3600i. *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019). And ViVitro's *service offerings* are irrelevant.[23]

Last, the generic customer testimonials that BDC mentioned in its brief below do not *even mention* any specific product, much less the VDT-3600i or any patented features, See APPX0858-0859, *again* showing BDC failed to meet its burden of establishing nexus. *Inventio AG v. Otis Elevator Co.*, 497 F. App'x 37, 43 (Fed. Cir. 2012). This Court should therefore not credit *any* of BDC's alleged objective indicia of nonobviousness because they are insufficiently connected to the claimed invention.

Accordingly, the district court did not abuse its discretion by not addressing evidence that is, as a matter of law, insufficient to show objective indicia of nonobviousness. Consequently, the district court did not abuse its discretion in finding a substantial question of validity, i.e., that BDC failed to show ViVitro's obviousness challenge lacks substantial merit. *BlephEx*, 24 F.4th at 1399.

## VII.  CONCLUSION

For all the foregoing reasons, ViVitro respectfully requests that this Court affirm the district court's denial of BDC's motion for preliminary injunction.

---

[23] In any case, ViVitro's product is not a copy, but a product of its own innovation adding new features that meet market needs not met by the VDT-3600i. APPX1160-1162 ¶¶ 20-26.

Date: <u>November 28, 2023</u>          <u>/s/ *Warren J. Thomas*</u>
                                        Warren J. Thomas
                                        John W. Harbin
                                        Meunier Carlin & Curfman LLC
                                        999 Peachtree St. NE, Suite 1300
                                        Atlanta, GA 30309
                                        (404) 645-7700
                                        WThomas@mcciplaw.com
                                        JHarbin@mcciplaw.com

                                        *Counsel for Defendant-Appellee*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-2393

**Short Case Caption:** Biomedical Device Consultants & Laboratories v. ViVitro Labs Inc.

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13909  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 11/28/2023     Signature: /s/ Warren J. Thomas

Name: Warren J. Thomas